IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF PARKER B.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF PARKER B., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

NICHOLE B., APPELLANT.


Filed January 22, 2019.    No. A-18-562.


Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH G. CRNKOVICH, Judge. Affirmed.

Susanne M. Dempsey-Cook, of Dempsey-Cook Law, for appellant.

Donald W. Kleine, Douglas County Attorney, Elizabeth A. McClelland, and David M. Ceraso, Senior Certified Law Student, for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Nichole B. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her son, Parker B. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Nichole is the biological mother of Parker (born in 2015). Although Nichole provided the Nebraska Department of Health and Human Services (DHHS) the name of Parker's alleged father, the record reflects that as of August 2017, DHHS had not been able to contact him, and a "Diligent Search Affidavit [had] been completed" so that the alleged father "can be published on." There is

- 1 -

nothing further regarding the alleged father in our record. Because Parker's father is not part of this appeal, he will not be discussed any further.

In March 2016, DHHS began working with Nichole on a voluntary basis after Parker was diagnosed with failure to thrive. Throughout the voluntary case, concerns regarding Parker's care continued.

On May 24, 2016, the State filed a petition alleging that Parker was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015) due to the faults or habits of Nichole in that: Nichole failed to provide Parker with appropriate medical care as recommended by treating physicians, and as a result the child failed to gain appropriate weight; Nichole failed to address her mental health needs, creating an unsafe and unstable environment for the child; Nichole failed to provide safe, stable and/or appropriate housing for the child; Nichole failed to provide the child with proper parental care, support, and/or protection; and due to the above allegations, the child was at risk of harm. That same day, the State filed an ex parte motion for immediate custody and pickup, which was granted by the juvenile court on May 25. The juvenile court granted DHHS temporary custody of Parker for placement in foster care or other appropriate placement, to exclude Nichole's home. Parker has been in foster care ever since.

A guardian ad litem was appointed for Nichole in August 2016.

On September 14, 2016, the State filed an amended petition again alleging that Parker was a child within the meaning of § 43-247(3)(a), but this time alleging that Parker was homeless or destitute, or without proper support through no fault of Nichole in that: Nichole failed to address her mental health needs, creating an unsafe and unstable environment for the child; Nichole's mental health symptoms include depression and paranoid behaviors; Nichole was unable to provide safe, stable and/or appropriate housing for the child; Nichole was unable to provide the child with proper parental care, support, and/or protection; and due to the above allegations, the child was at risk of harm.

In an "Adjudication/Disposition Hearing and Order" filed on September 23, 2016, the juvenile court adjudicated Parker to be within the meaning of § 43-247(3)(a) after a "[t]rial [was] held on stipulated facts" and the court found that the allegations of the petition were true. Nichole was ordered to: have supervised visits with Parker as arranged by DHHS; immediately undergo a psychological evaluation; immediately undergo a psychiatric evaluation and, if medication is prescribed, take the medication as prescribed; sign any releases of information so that all relevant information regarding her compliance with court orders and the case plan is made available to DHHS; maintain safe and adequate housing and a legal source of income; and provide monthly verification to the case manager that she is maintaining housing and income. Nichole was ordered to notify the court, all counsel in the matter, and DHHS of any change of address and phone number within 48 hours of the change.

After a "check hearing" in October 2016, the court found that DHHS had failed to schedule the psychological evaluation, but that the psychiatric evaluation was completed. After a "check hearing" in November, the court found that Nichole had completed both the psychiatric and psychological evaluations, but that the psychological evaluation was not yet available. After a "check hearing" in December, Nichole was ordered to immediately enroll in therapy to address the issues outlined in her psychological evaluation, and participate in and complete a parenting class.

After a review and permanency planning hearing in March 2017, the juvenile court also ordered Nichole to undergo an updated psychiatric evaluation and participate in family support services. After a review and permanency planning hearing in October, the juvenile court also ordered Nichole to complete a chemical dependency evaluation and comply with the recommendations. In November, Nichole was also ordered to: participate in and successfully complete a "Level 3.5 Short Term Co-occurring Residential Therapy Program" as arranged by DHHS/Nebraska Families Collaborative (NFC) and provide written proof of successful completion to DHHS/NFC; and submit to random drug and alcohol testing immediately upon the request of DHHS/NFC.

On November 30, 2017, the State filed a motion to terminate Nichole's parental rights to Parker pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Nichole substantially and continuously or repeatedly neglected and refused to give Parker necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the previous adjudication of the child; Parker had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in Parker's best interests.

TERMINATION HEARING

The hearing on the motion for termination of Nichole's parental rights to Parker was held over 2 days in April 2018. Five witnesses--all called on behalf of the State--testified. Exhibits 4, 6, and 11 (DHHS court reports from September 2016 and March and August 2017) were received without objection. A summary of the relevant evidence follows.

Exhibit 4, the DHHS court report dated September 16, 2016, includes the following information. Regarding an intake on April 26:

> Fremont police are requesting a worker ASAP as [Nichole] has some mental health issues and is having to leave the shelter she has been staying in. Nichole has been at a homeless shelter in Fremont[, Nebraska,] since March 19, 2016. Nichole has had many incidents where she gets very erratic and starts screaming about having money that no one helps her get. . . . . Nichole is not following guidelines that she's supposed to get a job which allows her to stay in the shelter. Nichole started screaming at shelter staff and "threw" the baby down hard in the stroller and walked to her room. Fremont police was [sic] called and they are at the shelter right now.

> Nichole is talking about how her memory has been erased and how DHHS and HFS are run by these three men that are kidnapping people. Nichole says that no one can look at the baby or talk to the babybecause [sic] she thinks thatpeople [sic] are trying to poison the baby.

The intake was deemed unfounded, but voluntary services were started. Due to ongoing safety concerns during the voluntary case, Parker was removed and the juvenile petition filed.

Exhibit 4 also states that Nichole was having six or seven visits per week for 4 hours a day in the Omaha, Nebraska, area. "Community resources for visits became an issue as [Nichole] was asked to leave and was no longer allowed to have her visits at the downtown library, other libraries, and some eating establishments." Nichole relocated to Gretna, Nebraska, and she "quickly ran out

of resources for her visits in the Gretna community." "The Gretna library and several local churches would not allow her to have her visits in their facility due to her erratic and paranoid behaviors." In July 2016, Nichole attempted to leave with Parker during a supervised visit; at that time, visits were reduced to twice a week for 2 to 3 hours.

Exhibit 6, the DHHS court report dated March 10, 2017, reveals that Nichole had supervised visits twice a week for 2 hours each visit. Nichole provided for Parker's basic needs during visits. There were some issues when Parker transitioned off baby formula to milk, "[a]s well as some dietary issues of making sure Nichole wasn't feeding him foods that would irritate his stomach has [sic] he has acid reflux." Nichole refused to meet with nutritionists at Children's Hospital on two separate occasions, stating that she knew what she could feed her son and that all children spit up. "[Nichole] does not believe [Parker] has acid reflux." Nichole was upset that when Parker turned 1 that he was to be drinking whole milk, not baby formula; "Nichole stated that the doctors were involved in some type of conspiracy related to foods and drinks." "Due to Nichole's explosive behaviors it has been a challenge to get visitation workers to be willing to work with her." Nichole would yell at the workers, and had "been rude and disrespectful to the workers as a means of bullying and intimidating them."

Exhibit 11, the DHHS court report dated August 11, 2017, states, "There was a period of time from January to March that it was noted that Nichole was spending more time on her phone than she was with her son; so she was asked to leave her cell phone off. It was noted that during the visitation times she was writing on her Twitter account about NFC, NDHHS, and posting pictures of NFC staff who were supervising her visits." "Nichole continues to struggle when redirected by PSW's during the visits." The exhibit also states:

> Nichole projects blame onto others and is often unpredictable, impulsive, and emotional [sic] labile. She seeks attention and excitement and is prone to hostile outbursts. She has difficulty in taking responsibility for her problems. She becomes verbally aggressive with those who often challenge her thoughts and beliefs. When she doesn't get what she wants, she bullies people, intimidates and will physically or verbally act out aggressively. Her aggressive behaviors have resulted in her getting arrested in March 2017 while residing in People's City Mission. On 3-12-17, she and another resident of the shelter got into an altercation. Nichole received a citation for Disturbing the Peace, a Class 3 misdemeanor, and Obstruction of Government Operations, Class 2 misdemeanor. She took her case to a bench trial and was found guilty and was given a fine. Per Twitter Nichole reported that she would take her clothes off for people to watch in order to pay her fine. . . . These types of requests can put Nichole in vulnerable and dangerous situations.

> It should also be noted that Nichole also tends to use social media to make personal attacks. She has made derogatory social media posts about the FPS, the FPS's family, NFC administration, DHHS legal and administration, [l]ocal law enforcement, her legal representation, senators, judges and various other professionals.

> There is no denying that Nichole loves her son but she is not capable to [sic] parenting her son in a stable and safe manner at this time.

The exhibit also sets forth DHHS' efforts to address Nichole's mental health needs.

The exhibits set forth above provide a general overview of the case; we now set forth the relevant testimony from the termination hearing.

Parker's foster mother testified that Parker had lived with her since October 2016. She testified that since that time, Parker has consistently visited with his mother twice a week. Parker "had acid reflux pretty bad when I got him," and was on medication for that for about 8 months, "and I noticed that after visits he would be throwing up a little bit more than normal"; he would vomit after almost every visit. "It seemed like he had a lot of milk because his acid reflux was a lot worse. Once he started on whole milk [at 1 year old], it was a lot worse and he would come home and vomit a lot." Parker's milk intake had to be limited, and once the foster mother communicated that to Nichole and shared the doctor's note about the milk, there was improvement in the amount of milk Parker was given during visits. Parker "was a lot more fussy and clingy when he came back from visits," "[n]ot every time but the majority of the time." The foster mother sent a communication book and "noticed that almost every single time [Nichole] had given [Parker] acetaminophen"; "a lot of times [Nichole] said, well, he was very fussy, so I gave him acetaminophen," or Nichole said "I took his temperature and it was like 99 something and so I gave him some acetaminophen." The foster mother was concerned about Parker receiving acetaminophen all of the time and so she followed up with Parker's physician with respect to the use of acetaminophen; the doctor wrote a note saying that it should not be given during visits. Nichole stopped giving the acetaminophen at that time, but started up again "within the last couple months"; it stopped again once it was communicated to the new visitation worker that the medication was not to be given. On cross-examination, the foster mother stated that after some visits, Parker would go to daycare and so she did not know what he was like when he came back from those visits. She also acknowledged that visits are over naptime so some of Parker's fussiness when he comes home could be that he was missing a nap.

Linda Zitek is a family permanency specialist (FPS) with PromiseShip, formerly known as NFC. Zitek testified that she was the FPS on this case from May 25, 2016, to September 17, 2017. She authored exhibits 4, 6, and 11, which we summarized earlier. When she was assigned this case, Zitek reviewed the case file and staffed the case with the prior worker and her supervisor because it was previously a noncourt case; the noncourt case began in March 2016. According to Zitek, Parker entered foster care in May 2016 for "[f]ailure to thrive" and never returned to Nichole's home. Nichole was residing at the Open Door Mission in May.

According to Zitek, Beneficial supervised Nichole's visits from May 27 to July 25, 2016, but they unsuccessfully discharged Nichole after an incident during a visit where "Nichole tried to take off with [Parker]" and law enforcement was called. PromiseShip then took over visitation services. During the visits supervised by PromiseShip, Nichole was on her phone a lot, and one time Nichole was not paying attention to Parker and he wandered off. Food was also an issue--Nichole did not like it when Parker was taken off formula and was given milk, and she did not want to hear concerns about his acid reflux (Nichole would just say "all babies spit up"). On cross-examination, Zitek acknowledged that Nichole attended all of her scheduled visits and provided for all of Parker's basic needs during visits.

Zitek testified that in September 2016, a psychological assessment and a psychiatric assessment were ordered. The psychiatric assessment was completed with Barb Thaler at Alegent Immanuel, CHI Health in October and Zitek received the report in December. According to Zitek,

Nichole was diagnosed with adjustment disorder and a substance abuse evaluation was recommended. (It was agreed between Zitek and Nichole's attorney that the original psychiatric evaluation was not complete and the juvenile court later ordered an updated evaluation in March 2017.) When Nichole showed up for her updated evaluation in May, it was discovered that Thaler had quit that morning. Zitek acknowledged that Nichole later reported setting up an appointment for such evaluation at CenterPointe in Lincoln, Nebraska, but that Zitek told her to cancel the appointment; Zitek said that an addendum had to be done by the same practitioner that did the original so they were trying to get her back into Alegent Immanuel, CHI Health. Alegent Immanuel, CHI Health made arrangements for Nichole to complete the updated evaluation through Bergen Psychiatric Associates, and Nichole completed the evaluation in September. When asked if the updated evaluation report was more thorough than the initial one, Zitek responded, "Not really, no." (Neither the original or updated psychiatric evaluations appear in our record.)

Zitek testified that Nichole completed the psychological assessment in November or December 2016 and was diagnosed with a paranoid personality disorder (the psychological evaluation does not appear in our record). As a result of that evaluation, therapy was ordered; Zitek had to find somebody that knew how to work with personality disorders. Zitek provided Nichole with a list of Region 6 providers to contact and offered to assist if there were payments. Because Nichole "was not showing any initiative," Zitek called a lot of the Region 6 providers and called some other therapy offices to set up therapy services. However, Zitek was not able to find an available therapy provider for Nichole in Omaha, "mainly just because of [Nichole's] personality disorder."

In December 2016 or January 2017, Zitek found out Nichole was living in a storage locker, and found out Nichole had been banned from the Open Door Mission in June 2016. Zitek knew that Nichole had been staying in hotels in July and part of August, but after August, Zitek did not have an address for Nichole because Nichole "really was never good at disclosing where she was at." When Zitek learned Nichole was living in a storage locker, Zitek tried to get Nichole back into the homeless shelters in Omaha but found out that Nichole "had been banned from all of them" because of physical altercations with staff and other people living there; Nichole was banned from Open Door Mission and the Stephen Center for 1 year and banned from Siena Francis for life. Nichole had also been at the Jefferson House in Fremont, but was not allowed to go back there until she was "medication compliant." Nichole did not want to go to Council Bluffs, Iowa, so the family support worker (FSW) got her into a shelter, the People's City Mission, in Lincoln, in January 2017. To the best of Zitek's knowledge, Nichole has remained at the People's City Mission since that time. Although the usual amount of time that an individual is allowed to stay at a shelter is 6 months, People's City Mission "kept extending her" because "[t]hey were trying to help her get housing and other benefits that she could use."

After Nichole moved to Lincoln, Zitek tried to find her a therapy provider in Lincoln. Zitek found a FSW through Better Living to assist Nichole with setting up therapy services. The FSW worked with Nichole from January 20, 2017, to the first part of April; the goals were to get involved in therapy, housing, and employment. Zitek testified that the FSW was able to get Nichole stable employment. Zitek got "verification" that Nichole worked at a restaurant from February to June 2017, at which time Nichole reported she was fired due to a personality conflict with the manager. The FSW was not successful in assisting Nichole to get stable housing. On

cross-examination, Zitek acknowledged that during her time on the case, Nichole consistently had housing "in the shelter" while in Lincoln.

In February 2017, the FSW got Nichole into CenterPointe, "an all-inclusive program" that does "housing, mental health, substance abuse, medication management." CenterPointe did an initial assessment and then set up an appointment with Nichole but she "was a no-show." Nichole would not reschedule and "refused to work with them after that."

Zitek reached out to various providers and "they all pointed back to CenterPointe because it was inclusive for all Nichole's needs." Zitek specifically reached out to three Region 6 providers, but there was no response back from one of the providers, and the other two places (one of which was Lutheran Family Services) had therapists but Nichole had to call; "[a]lmost all the programs require the client to call." Zitek provided Nichole and the FSW the information. In June, Nichole went to Lutheran Family Service to find a therapist, but to Zitek's knowledge Nichole never started working with a therapist there; "[a]ll that they could say without a -- because there was no release, was that she was in their data base" but that "[t]here was no appointment." In June or July, Nichole sought out Dr. John Herdman; Nichole called Zitek and said she had signed a release for Dr. Herdman's office to talk to Zitek. Zitek contacted Dr. Herdman's office that same day and they informed her that they did not have any immediate openings but that they could provide individual counseling to Nichole, they just needed a letter of agreement for payment purposes. After receiving the fee information from Dr. Herdman's office, Zitek was not able to set up a letter of agreement because "[N]ichole didn't inquire about treatment or make an appointment, and I needed to have that in order to set up a letter of agreement that she was going to be willing to work with them." Zitek let Nichole know that Nichole would need to call Dr. Herdman's office and schedule an appointment or find out the availability for an appointment. A month later Zitek emailed Dr. Herdman's office to ask if Nichole ever made an appointment or inquired about treatment services, but they said she had not. After Nichole did not schedule an appointment with Dr. Herdman, Zitek told her not to set up an appointment with him and to try to find a therapist at a Region 5 provider because "administration" told Zitek it had to be a Region 5 provider.

According to Zitek, the FSW's working relationship with Nichole ended in April 2017. Zitek explained that Nichole was putting the FSW's contact information and derogatory comments (e.g., that the FSW was "a lousy worker") on Nichole's Twitter account, and they thought that was a safety concern. A new FSW from the Child Savings Institute in Omaha was assigned from May or June to August or September 2017 when Nichole reached "maximum benefits"; Nichole told the FSW that she did not want to move back to Omaha.

Zitek testified that in March 2017, Nichole got arrested for disturbing the peace and obstructing government process after an altercation at the People's City Mission. Nichole received another citation in June for urinating in public. Other concerns included Nichole's "tweets" about "consuming alcohol, getting drunk, blacking out" and that "possibly she was being drugged and taken advantage of." In June, Nichole was intoxicated at the People's City Mission and "they had law enforcement come and take her to detox because she had a .219, I think, blood alcohol level."

Nichole also completed parenting classes in the summer of 2017. However, Zitek did "drop-ins" at the visits and based on her observations, Nichole did not appear to have internalized what was being taught in the parenting classes. Zitek continued to have concerns that Nichole did not understand the developmental stages of a child. Zitek stated that Nichole "didn't like [Parker]

interacting with other children," and "one time [Nichole] was reading a book, but it really wasn't a children's book . . . [Parker] didn't want to sit there, and she just kind of forced him and kept saying no, . . . you're going to sit here to read it."

Zitek testified that Nichole had delusional thinking. For example, Nichole "said she wrote a book when she was 17 that saved a country"; Nichole had been looking for this million dollar bank account that she won gambling; and Nichole said she had a 3-year-old son that the State had taken custody of (when asked about it later, Nichole said she only had one son, Parker).

Zitek testified that it was in Parker's best interests to terminate Nichole's parental rights. Zitek's opinion was based on the length of time Parker had been in care, Nichole's lack of willingness to address issues such as stable housing, and the fact that her mental health and substance abuse issues would hinder her ability to parent Parker safely.

Kristine Limbach is an operations support supervisor with PromiseShip; she supervises parenting time workers and family support workers. Limbach had staff supervising Nichole and Parker starting in July 2017. Limbach met with her workers at least twice a month to "staff families," and they would talk about the families and the caseloads, other services the families could use to become successful or to meet their court goals, and they would assess safety and risk. Limbach also reviewed the visitation workers notes. She said that one staff member supervised Nichole's visits from July 17 to October 25 and he expressed concerns that Nichole did not have age appropriate expectations for Parker and that she did not use age appropriate discipline.

Kristi Goldenstein is an operations support supervisor with PromiseShip. In her position, Goldenstein supervises visitation and family support workers, accepts referrals for the staff, has weekly supervision with staff, talks with staff if they have any concerns, makes recommendations, and helps them if they have struggles with families or with getting family team meetings. Goldenstein supervised three workers who worked with the family from the end of July 2016. The first worker was on the case from July to the end of August and provided visitation and family support. The goals were to help Nichole identify permanent housing, help with parenting skills, help get court-ordered evaluations set up, and address transportation concerns. Housing was not achieved; Nichole got on a wait list for housing and was no longer able to utilize shelters because of past behaviors. The worker could not get Nichole to engage very well; Nichole "would oftentimes get preoccupied with a bank account that contained millions of dollars that she would want the workers to help her find." Nichole reached "maximum benefits" with that worker. A new worker was assigned from August 2016 until the end of January 2017 for parenting time only. That worker struggled to redirect Nichole with appropriate discipline because Nichole "just didn't listen to what [the worker] had to say." Goldenstein thought that trying a different worker who could take a different approach and establish a different type of relationship might be of benefit. So another new worker took over and provided visits from January until the beginning of July. That worker had concerns about the type of discipline Nichole was utilizing. Nichole would put Parker into time-outs when he was not at a developmental age where he could comprehend what that meant. "She would place him in a corner, or she would sometimes strap him . . . into a stroller," "[o]r she would place him on her lap and hold his hands down as a form of discipline." "If he was grabbing at her glasses, she would hold his hands down . . . instead of just trying to redirect" him. The worker reported trying to redirect Nichole but that Nichole did not accept the redirection and Nichole would say that she knows how to parent her child and that "[the worker's] job was just to

sit and take down notes, not to talk to her." On cross-examination, Goldenstein acknowledged that no safety concerns for the child were reported to her. However, in November or December 2016, the assigned worker reported to Goldenstein that Nichole would say "very erratic things." For example, Nichole "talked about how . . . [the worker] had created a transmitter of some sort that would have intercepted [Nichole's] videotaping on a visit, because she said that when she got home, that the video was no longer there and so it must have been [the worker's] fault." Nichole "also said that . . . [the worker] was on a TV episode of South Park" and that Nichole had "seen [the worker's] picture on billboards around town" because of this transmitter. These reports were concerning to Goldenstein because it appeared that [the worker] was "getting wrapped into" Nichole's "delusions" and "that probably wasn't very healthy" for either. Goldenstein also received a complaint when the last worker was on the case that Nichole had taken a photo of the worker during the visits and posted it "on a social media account and had some inappropriate comments about NFC and DHHS along with it"; Nichole was "upset about the situation . . . that there was somebody there supervising her visits and -- essentially voicing her concerns about it all." At a family team meeting it was ultimately decided that Nichole was not to have her phone during visits for a period of time.

Brenda Luby is an FPS supervisor with PromiseShip. Luby testified she became the ongoing supervisor for this case on June 6, 2016. When assigned to this case, Luby reviewed the case file and staffed the case with the prior worker and their supervisor. During that staffing, Luby learned the history of the case. Parker and Nichole were receiving noncourt services starting in March due to concerns that Nichole was not meeting Parker's nutritional needs. Parker was diagnosed with failure to thrive and Nichole seemed to have some mental health and housing issues at the time. Throughout the noncourt case, there were ongoing concerns that Nichole was not meeting her son's needs. Nichole and Parker were in a homeless shelter and law enforcement had been called because Nichole was out of control and had forcibly thrown Parker; Parker was removed and placed in foster care on May 25, and has remained in out-of-home care ever since.

While Luby has been on the case, three FPS workers have provided services, including Linda Zitek. On cross-examination, Luby agreed that there was a poor relationship between Nichole and Zitek. Luby explained that the communication between Nichole and Zitek oftentimes would escalate and Nichole did not trust Zitek. Nichole made statements that she was being "set up" and would often "[tweet] information negative towards providers, towards personnel, towards [DHHS] staff, towards . . . Zitek, toward the [j]udge, which caused relational issues." Luby never saw any evidence of unprofessional behavior by Zitek. After Nichole's counsel filed a motion for early review, DHHS legal staff recommended that a new case manager be assigned.

Luby met with staff a minimum of every 60 days to discuss a case. As a supervisor, Luby has also met and worked with Nichole. Luby testified that during her time on the case, Nichole had not had consistent employment and that she was not employed at the time of the termination hearing. Additionally, during the pendency of this case, Nichole's housing had been inconsistent--Nichole had stayed in hotels and a storage facility, but most of the time had resided in homeless shelters off and on. Nichole resided at the People's City Mission from January 2017 until mid-March 2018. Nichole was originally in a private room when she went to the People's City Mission, but she lost her private room after the People's City Mission discovered Nichole drinking alcohol (in violation of the facility's rules) and she had to be taken to detox by law

enforcement; when she returned she was in "just a standard emergency shelter sleeping on the floor next to people she [didn't] know." When asked what she believed had been the barriers to Nichole maintaining safe and adequate housing, Luby responded, "I think the primary barriers, [Nichole's] inability to have positive relationships with people. She has extreme [p]aranoia. So a general conversation with her, with good intentions, will not be -- always be perceived that way with her. In extreme stressful situations that paranoia intensifies." However, Nichole "recently achieved housing through a program through CenterPointe and moved into her own apartment on March 15th, 2018." But it was still concerning to Luby that Nichole only recently obtained housing because Luby had not "seen a period of stability," and was "unaware if [Nichole] can maintain this housing." "[Nichole] has already had communication with the landlord that is concerning, with extreme paranoid thoughts." "In those thoughts [Nichole] speaks about people breaking into her house, moving her objects, hearing things, voices coming out of the fan, feeling like she has to investigate all of her own concerns because law enforcement won't assist her." Luby stated that, "Parker needs stable housing in order to meet his needs educationally, emotionally, and medically. He needs to be able to know where he's going to sleep at night, and that is not the lifestyle that Nichole has demonstrated throughout the pendency of this case."

According to Luby, Nichole had been engaged in therapy at CenterPointe since January 2018. Nichole had only attended four sessions between then and the week prior to Luby's testimony in April, and the current therapist felt like Nichole was still unstable and not in a place where reunification would be successful. When asked if it was concerning to her that Nichole had only had four sessions of therapy in the past 3 months, Luby said, "Yes," because "it speaks to the level of [Nichole's] motivation and insight into the barriers to achieving . . . [reunification] with her son." Luby testified that CenterPointe had been an option for Nichole since January 2017, but Nichole had been unwilling to work with CenterPointe at that time; Nichole attended one intake appointment but did not return for the second required appointment, saying that she did not want to go there.

Luby acknowledged that Nichole completed two psychiatric evaluations, a psychological evaluation, a chemical dependency evaluation, and a parenting class, and that she consistently participated in visitation. However, Luby testified that it was in Parker's best interests to terminate Nichole's parental rights. Luby's opinion was based on her "working with Nichole . . . since June of 2016, review of files, review of intakes, review of case plan/court reports, review of two psychiatric evaluations, psychological evaluations, chemical dependency evaluations, [and] provider reports."

JUVENILE COURT'S DECISION

In an order filed on May 10, 2018, the juvenile court terminated Nichole's parental rights to Parker after finding that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that termination of parental rights was in Parker's best interests.

Nichole appeals the juvenile court's order.

ASSIGNMENTS OF ERROR

Nichole assigns, reordered and restated, that the juvenile court erred in (1) permitting certain witness testimony in violation of her due process rights, (2) finding that statutory grounds

exist to terminate her parental rights, and (3) finding termination of her parental rights was in Parker's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### WITNESS TESTIMONY

Initially we note that Nichole's assignment of error states, "The Separate Juvenile Court of Douglas County erred in permitting the testimony of Luby, Limbach and Goldenstein as such testimony violated the mother's due process rights." Brief for appellant at 3. However, in the argument section of her brief, Nichole also claims that portions of Zitek's testimony were erroneously admitted. Because Zitek was not specifically mentioned in Nichole's assignment of error, we will not address any error argued with regard to Zitek's testimony. See *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error). Therefore, we will only address Nichole's challenges to the testimony of Luby, Limbach, and Goldenstein.  In her brief, Nichole argues, "None of the foregoing witnesses had first-hand knowledge of the mother or her interactions with Parker. Each of these witnesses only provided, at best, second hand information about the events of this case, instead relying on information contained in reports or received through interactions with other professionals." Brief for appellant at 11. Nichole asserts this is "a clear violation" of her "right to confront and cross examine her accusers." *Id.* She claims, "Nebraska Appellate Courts have long held that the testimony of proxy witnesses is not permitted in hearings regarding the parental rights of an individual. It does not pass Constitutional muster for the State to use a case manager to provide testimony for others who have first-hand knowledge of the facts." Brief for appellant at 11-12.

While it is true that the appellate courts have cautioned against using proxy witnesses, see *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005), the Nebraska Supreme Court has clarified and distinguished such situations, stating,

> In *In re Interest of Aaron D.*, only one witness testified for the State, while at least three witnesses--the mother, the child, and a family therapist--testified for the mother. Here, the State presented the testimony of four witnesses; no one testified on [the mother's] behalf.
>
> In *In re Interest of Aaron D.*, the lack of other witnesses for the State was particularly problematic. It used a DHHS caseworker "as a proxy for all of the other witnesses whose expertise and testimony would have been helpful . . . in determining what was in [the child's] best interests." The caseworker's testimony was largely based on her review of records generated by those who directly observed the mother and child. Thus, much of the caseworker's testimony was based on hearsay. And in some instances, that hearsay evidence was contradicted by the testimony of the mother's witnesses.

The situation here differs in two respects. Although [the FPS] provided testimony based on her review of records and reports generated by others, the record shows that she did more than merely review documentation in the case file. She spoke with [the mother] in person and over the telephone, and she also communicated with various individuals providing services to [the mother]. And [the FPS'] testimony was generally uncontradicted. But more importantly, the State adduced testimony from others who directly worked with [the child and the mother]. This is in sharp contrast to *In re Interest of Aaron D.*, where much of the State's evidence was based on hearsay.

*In re Interest of Alec S.*, 294 Neb. 784, 794-95, 884 N.W.2d 701, 707-08 (2016).

This case is similar to *In re Interest of Alec S.* Here, the State presented the testimony of five witnesses, and no one testified on Nichole's behalf. And although Luby provided testimony based on her review of records and reports generated by others, the record shows that she did more than merely review documentation in the case file. She stated she worked with Nichole since June 2016, and she also communicated with various individuals providing services to Nichole. And Luby's testimony was generally uncontradicted. The State also adduced testimony from others who directly worked with Nichole and Parker, namely Zitek and the foster mother. Additionally, we note that Nichole cannot show prejudice regarding the testimony of Limbach, Goldenstein, and Luby, as we explain below.

As for Limbach, there is no indication in the record that she personally met Nichole or observed Nichole with Parker. Limbach's testimony was basically that one visitation worker she supervised expressed concerns that Nichole did not have age appropriate expectations for Parker and that she did not use age appropriate discipline. Even if Limbach's testimony was improperly received, Nichole cannot show that she was prejudiced by such testimony because that same information appears in exhibit 11 (DHHS court report prepared August 11, 2017), which was received without objection. See *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999) (evidence objected to, which is substantially similar to evidence admitted without objection, results in no prejudicial error).

The same is also true with respect to Goldenstein's testimony. There is no indication in the record that she personally met Nichole or observed Nichole with Parker. Goldenstein testified that she supervised three workers who worked with the family from the end of July 2016. The goals were to help Nichole identify permanent housing, help with parenting skills, help get court-ordered evaluations set up, and address transportation concerns. Housing was not achieved; Nichole got on a wait list for housing and was no longer able to utilize shelters because of past behaviors. Workers could not get Nichole to engage very well because she "would oftentimes get preoccupied with a bank account that contained millions of dollars that she would want the workers to help her find." Nichole would not take redirection from others during visits, saying that she knew how to parent her son. Visitation workers had concerns about the type of discipline Nichole was utilizing. Goldenstein also received a complaint from a visitation worker that Nichole had taken a photo of the worker during the visits and posted it "on a social media account and had some inappropriate comments about NFC and DHHS along with it." Nichole cannot show that she was prejudiced by such testimony because substantially similar information appears in exhibits 4, 6, and 11 (DHHS

court reports prepared September 2016, and March and August 2017), which were received without objection. See *In re Interest of Natasha H. & Sierra H., supra.*

As for Luby's testimony, again, some of it is substantially similar to information that appears in exhibits 4, 6, and 11--exhibits received without objection--and thus Nichole cannot show she was prejudiced by such testimony. See *In re Interest of Natasha H. & Sierra H., supra.* And, as stated previously, Luby did not simply rely on information contained in reports or relayed to her by others. Luby stated she had been working with Nichole since June 2016. Thus, Luby would have some first-hand knowledge of the situation, and would not merely be a "proxy" for other witnesses.

Because we do not find that Nichole was prejudiced, we find no reversible error with respect to the testimony of Limbach, Goldenstein, and Luby.

### STATUTORY GROUNDS FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Nichole's parental rights to Parker, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(6) (reasonable efforts failed to correct conditions leading to adjudication), and § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months).

In her brief, Nichole concedes that "Parker was out of home for a period of time that exceeded the 15 month trigger of [§ 43-249(7)]." Brief for appellant at 10. And the record reflects that termination on such grounds was proper. Parker had been in an out-of-home placement continuously since May 24 or 25, 2016. At the time the motion for termination of parental rights was filed on November 30, 2017, Parker had been in an out-of-home placement for 18 months. At the time the termination hearing commenced on April 6, 2018, he had been in an out-of-home placement for 22 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Nichole's parental rights under § 43-292(7) were proven by sufficient evidence. We therefore need not consider Nichole's argument with respect to the propriety of the termination of her parental rights pursuant to § 43-292(2) and (6), since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra.* Thus, the next inquiry is whether termination of Nichole's parental rights is in Parker's best interests.

### BEST INTERESTS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nichole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nichole M., supra.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Nichole has completed two psychiatric evaluations, a psychological evaluation, a chemical dependency evaluation, and a parenting class, and she consistently participated in visitation. However, Nichole has not maintained stable employment or housing. Prior to January 2017, Nichole had stayed in hotels and a storage facility, but most of the time had resided in homeless shelters off and on, but was banned from most of them in the Omaha area. Nichole did consistently reside at the People's City Mission in Lincoln from January 2017 until mid-March 2018. However, she lost her private room after she was discovered drinking alcohol and had to be taken to detox; when she returned she was in "just a standard emergency shelter sleeping on the floor next to people she [didn't] know." Nichole obtained an apartment in the month leading up to the termination hearing, but it was too soon to be considered a "period of stability" and Luby had concerns about whether Nichole would be able to maintain the apartment as Nichole had already had communications with the landlord with "extreme paranoid thoughts" (i.e. people breaking into her house, moving her objects, hearing things, voices coming out of the fan, feeling like she has to investigate all of her own concerns because law enforcement would not assist her). Luby stated, "Parker needs stable housing in order to meet his needs educationally, emotionally, and medically. He needs to be able to know where he's going to sleep at night, and that is not the lifestyle that Nichole has demonstrated throughout the pendency of this case."

Additionally, Nichole had only recently begun therapy at CenterPoint in January 2018, and had only completed four sessions between then and the time of the termination hearing. Although in her brief Nichole tries to place blame on the FPS for not being able to locate a provider, Luby testified that CenterPointe had been an option for Nichole since January 2017 (Zitek said February), but Nichole had been unwilling to work with CenterPointe at that time; Nichole attended one intake appointment but did not return for the second required appointment, saying that she did not want to go there.

Both Zitek and Luby testified that it was in Parker's best interests to terminate Nichole's parental rights. Nichole made little progress over the duration of this case. In addition to the employment and housing concerns, and her unwillingness to work with the available therapy provider for nearly 1 year, Nichole was still having fully supervised visits with Parker. At the time of the termination hearing, Parker had been in an out-of-home placement for 22 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best

interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra.* We find that the State has rebutted the presumption of parental fitness as to Nichole. We further find that there is clear and convincing evidence that it is in Parker's best interests to terminate Nichole's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Nichole's parental rights to Parker.

AFFIRMED.